**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J., and BOGGS, J.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**September 23, 2015**

# In the Court of Appeals of Georgia

A15A1443. DRISKELL v. THE STATE.                    BO-054C

BOGGS, Judge.

A jury acquitted Corroll Driskell of pointing a gun or pistol at another, but found him guilty of simple assault. He now appeals, asserting as error the trial court's instructions to the jury and the admission of certain evidence. For the following reasons, we affirm.

The evidence showed that Driskell and Fanolla Redmon, the divorced parents of a minor girl, met at a Starbucks location to exchange custody of the child. Driskell was with his wife, Angie Driskell, and Redmon was with her then boyfriend, Joseph Henry. After the parties arrived to exchange the child, Driskell and Redmon were standing outside of their vehicles having a conversation that escalated into an argument. Henry testified that at some point, he exited Redmon's vehicle and told

Driskell to let Redmon "talk so it could be, you know, a regular conversation." He stated that Driskell became irate, and "began yelling and screaming, telling [him] you don't tell me what the 'F' to do. How dare you insert yourself in this." Henry asserted that he just stood there with his arms folded while Driskell shouted at him. He explained further that as Driskell continued to yell at him, Driskell "pulled a gun out and said, I'm going to kill you, you are going to die, and he cocked it back. And while he was doing that, pointing it at me, his wife was pushing him back." Henry explained that Redmon and then Mrs. Driskell attempted to calm Driskell down, and that moments later, the Driskells got into their car and drove away.

Redmon testified that when they arrived at Starbucks, Driskell was upset that she was late in returning the child, and that their discussion escalated into an argument. She explained that when Henry interjected, Driskell lost his temper and she and Mrs. Driskell attempted to calm him down. Redmon stated that at some point Driskell "reache[d] behind his back, he pulled a gun out, and he was pointing . . . in the direction of Mr. Henry, like he was going to shoot him."

Driskell testified in his own defense that after his daughter greeted him and got into his car, he turned to get into the car himself when Redmond immediately began pulling on him. He stated that she pulled on him and "pushed [him] trying to get [his]

2

attention." Driskell explained that Henry then "jump[ed] out of that car and start[ed] just charging at me." He stated that Henry starting yelling and screaming at him and that his wife then "ran in between [them]." Driskell explained that while Redmon continued to pull on him, he felt his gun, which he had a license to carry, "just shifting back and forth in the holster," and so he "immediately reached under my jacket. I took the holster and the gun, with the butt facing to my left, I used my off hand, my right hand, and I went to put it in my pocket. It didn't immediately go in my pocket, but eventually I got it in my pocket once [Redmon] stopped grabbing me." Driskell testified that he never pointed the gun at Henry.

Mrs. Driskell testified that after the child gave Driskell a hug and got into the backseat of his car, Driskell turned to walk away and Redmon began "pulling on him." She stated that Henry began shouting profanity at Driskell and moved toward him. Mrs. Driskell explained that she then got out of her vehicle and got in between the two men, while Redmon continued to "pull[ ] and yank[ ] on [Driskell], trying to get him to turn around and talk to her." She explained that she stood in between Driskell and Henry as they continued to shout at each other, and that at some point, Driskell "reach[ed] in the back, small of his back and pull[ed] out his holster with his gun, and st[u]ck it in his pocket." Mrs. Driskell testified that Driskell pulled the gun

3

out of the small of his back with his nondominant hand and that the gun was out "no more than a couple of second[s]." She stated that Driskell never pointed or cocked the gun.

After the parties left the scene, Redmon called police, and she and Henry drove to the police station to file a report. Driskell was charged by accusation with pointing a gun or pistol at another and simple assault. A jury found him guilty of the assault, but not guilty of pointing a gun at another. It is from this verdict that he now appeals.

1. Driskell first contends that the trial court erred in its instructions to the jury. As he concedes, his trial counsel made no objection following the court's instructions, so his claim here is one of plain error.

> The failure to object to a charge as given precludes appellate review
>
> unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties. OCGA § 17-8-58 (b). An appellate court is required to review for plain error an alleged jury instruction error to which no objection was raised at trial, provided the enumeration of error is properly enumerated and argued on appeal. Since new appellate counsel has properly asserted an error in the jury instructions on appeal, we review the omission of the charge . . . to determine whether it constituted plain error, regardless of the lack of preservation below. Reversal is authorized if all four prongs of the standard adopted in [*State v.*] *Kelly* [290 Ga. 29 (1) (718 SE2d 232)

(2011)] are met: the instruction was erroneous, the error was obvious, the instruction likely affected the outcome of the proceedings, and the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citations and punctuation omitted.) *White v. State*, 291 Ga. 7, 8 (2) (727 SE2d 109) (2012).

Driskell complains of the following instruction: "I charge you that the offense of simple assault is complete if there is a demonstration of violence coupled with apparent present ability to inflict injury so as to cause a person, against whom it is directed, reasonably to fear that he will receive a violent injury unless he retreats to secure his safety." He asserts that this instruction is from *Thomas v. State*, 99 Ga. 38, 44 (26 SE 748) (1896), and "pertains to the common law version of assault." Driskell argues that because the only definition of assault that existed when *Thomas* was decided was "an attempt to commit a violent injury on the person of another," the court, in giving the instruction, charged the jury on subsection (a) (1) of OCGA § 16-5-20 rather than subsection (a) (2), under which he was charged.

We agree that a portion of the one-sentence instruction was erroneous under these particular circumstances. The trial court gave the standard charge from the Suggested Pattern Jury Instructions, "§ 2.20.11. Assault, Simple; Reasonable Fear"

5

which includes the complained-of sentence. The instruction cites to this court's opinion in *Reeves v. State*, 128 Ga. App. 750, 752 (2) (197 SE2d 843) (1973), and *Reeves* in turn cites to the Georgia Supreme Court's opinion in *Thomas*, decided in 1896. In 1896, assault was defined only as "an attempt to commit a violent injury on the person of another," currently OCGA § 16-5-20 (a) (1). See *Thomas*, supra; Georgia Penal Code 1896 § 95. It was not until the Georgia Code was revised in 1968 that the second method of committing simple assault was added and defined as: "commit[ing] an act which places another in reasonable apprehension of immediately receiving a violent injury." See Ga. Laws 1968, p. 1280; see also *Rhodes v. State*, 257 Ga. 368, 369 (4) (359 SE2d 670) (1987). The Supreme Court's statement in *Thomas* defining when an assault is complete therefore related only to when an attempt to commit a violent injury is complete. The court explained:

> there need not be an actual present ability to commit a violent injury upon the person assailed, but if there be such a demonstration of violence, coupled with an apparent ability to inflict the injury, so as to cause the person against whom it is directed reasonably to fear the injury unless he retreat to secure his safety, and under such circumstances he is compelled to retreat to avoid an impending danger, the assault is complete, though the assailant may never have been within actual striking distance of the person assailed.

6

*Thomas*, supra, 99 Ga. at 44.

Driskell was charged by accusation of simple assault pursuant to the language in OCGA § 16-5-20 (a) (2) for committing "an act which placed . . . Henry[ ] in reasonable apprehension of immediately receiving a violent injury." But the trial court, in quoting the rule from *Reeves* and *Thomas*, instructed the jury on a "demonstration of violence" and an "ability to inflict the injury" involved in an attempt to commit a violent injury pursuant to subsection (a) (1). For this reason, the instruction was erroneous.

Nevertheless, we hold that the instruction failed to satisfy the remaining three prongs of the plain error standard. The error in the instruction was not obvious. A closer look at the rule from *Thomas* reveals that while it employs language applicable to subsection (a) (1), it also includes language consistent with the reasonable apprehension method of committing simple assault in subsection (a) (2): "so as to cause a person, against whom it is directed, reasonably to fear that he will receive a violent injury."[1] It appears then that subsection (a) (2) codified a portion of the rule

[1]We note that there would be no error in the giving of this portion of the pattern instruction where the indictment or accusation is sufficient to allege that a defendant committed simple assault under both OCGA § 16-5-20 (a) (1) and (a) (2). Cf. *Cannon v. State*, 223 Ga. App. 248, 249 (2) (477 SE2d 381) (1996). We therefore caution trial courts against the giving of this instruction where the indictment or accusation

7

from *Thomas.* So a portion of the court's instruction was in fact applicable to subsection (a) (2) as charged here.

We conclude further that the instruction did not likely affect the outcome of the proceedings nor did it seriously affect the fairness, integrity or public reputation of the judicial proceedings. The jury was provided with the indictment and the trial court correctly instructed the jury on the language of OCGA § 16-5-20 (a) (2) as charged in the accusation. The court further instructed that the State must prove guilt and intent beyond a reasonable doubt, that the jury was authorized to convict if it believed that Driskell committed "the offenses charged in the way and manner alleged," and that the "issue in this case is formed by these charges as made by these accusations." Upon reviewing the instruction as a whole, it is unlikely that had the trial court omitted the improper language, the jury would have reached a different verdict. As the Georgia Supreme Court has held,

> [w]hile it is true that, where the indictment charges a defendant committed an offense by one method it is reversible error for the court to instruct the jury that the offense could be committed by other statutory methods with no limiting instruction, the defect is cured … where the court provides the jury with the indictment and instructs jurors

charges simple assault by only one method.

that the burden of proof rests upon the State to prove every material allegation of the indictment and every essential element of the crime charged beyond a reasonable doubt.

(Citations and punctuation omitted.) *Faulks v. State*, 296 Ga. 38, 39 (2) (764 SE2d 846) (2014); *Givens v. State*, 294 Ga. 264, 268 (3) (751 SE2d 778) (2013) (court's sua sponte instruction on criminal negligence in malice murder case not plain error where jury was informed of crime as charged in the indictment, the elements of the crime, and that the State had the burden to prove each element beyond a reasonable doubt).

Driskell also argues that because the jury acquitted him of pointing a gun at Henry, it "rejected the only thing the State argued Driskell did to commit the assault," and there was therefore an inconsistency between the verdicts demonstrating jury confusion. But the inconsistent verdict rule has been abolished in Georgia. See *State v. Springer*, ___ Ga. ___ (1) Slip op. at 4 (Case No. S14G1539; decided June 29, 2015) ("abolition of inconsistent verdict rule is consistent 'with the principle that it is not generally within the trial court's power to make inquiries into the jury's deliberations, or to speculate about the reasons for any inconsistency between guilty and not guilty verdicts.[Cits.]'")

2. Driskell asserts that the trial court erred in allowing the State to elicit testimony from a police detective about hypothetical situations. Driskell called the detective as a witness. On direct examination, he explained that as part of his investigation, he attempted to locate witnesses to the incident, including the 911 caller, as well as surveillance from the Starbucks and nearby businesses, but was unsuccessful. He explained that after interviewing the Driskells, Henry, and Redmon, he concluded that while "all acted inappropriately that day . . . it came down to . . . one person's word against another," he had "no probable cause to actually charge anyone with anything."

On cross-examination, the State asked the detective: "Do you feel like somebody would be in fear of their life if you're saying somebody wanted them to know they had a gun?" The detective responded, "I think it depends on the situation of how they're trying to go about letting somebody know." And when asked "If somebody had a weapon and they wanted you to see that they had a weapon, would you be in fear that, oh, they could use that weapon towards you . . . And therefore that could be simple assault?," to which the detective responded, "Sure . . . It could be." In each instance, trial counsel objected that the State was invading the province of the jury, but the objections were overruled. Later during the cross-examination, the State

10

asked the detective if he would have probable cause for arrest in the case of an allegation of rape "if it was a woman stating that she had been raped and the defendant stating that he didn't do it." The detective stated that he would not make an arrest based on one person's word against another, that he had never had a domestic violence case where an arrest was made in the face of no physical injuries, and that he does not make an arrest unless there is probable cause. Trial counsel also objected to this line of questioning on the basis of "relevance and speculation"; the trial court overruled the objection.

While citing no legal authority in support of this claim of error, Driskell complains that the State's cross-examination was improper because the detective was not admitted as an expert and the hypothetical questions "had no bearing on the facts presented in the instant case." Even assuming the line of questioning in both of these instances was improper, and that counsel raised the proper objection, we can find no harm here as in each instance the detective gave no definitive answer to the questions posed by the State and stated that he would not make an arrest based only upon one person's word against another, and even repeated that in this case, he found no probable cause to make an arrest. See, e. g., *Turbeville v. State*, 160 Ga. App. 818,

819 (2) (287 SE2d 670) (1982) (reversal not required where no harm from cross-examination).

3. Driskell argues that the 911 call violated the confrontation clause because the caller did not testify at trial. He contends that the caller's statements should have been excluded as testimonial in nature.

> As the Supreme Court of Georgia has noted, telephone calls made to 911 centers may be nontestimonial and therefore admissible at a later trial if the telephone call is made to avert a crime in progress *or* to seek assistance in a situation involving immediate danger. The determination of whether the recording of a 911 phone call is testimonial should be made on a case-by-case basis.

(Citation and punctuation omitted; emphasis in original.) *Owens v. State*, 329 Ga. App. 455, 457 (1) (a) (765 SE2d 653) (2014).

The 911 caller, a manager at the Starbucks, told the dispatcher that a "gentleman that has just our left parking our parking lot. Uh, he just had a gun out on a previous gentleman." He stated further that there had been a "big commotion," and that both of the vehicles involved were still in the parking lot. As the caller was speaking to the 911 dispatcher, both vehicles exited the parking lot. The caller declined the dispatcher's offer to send an officer to the scene or to file a report,

12

explaining that he just wanted to report the incident and that he was just "making sure the pedestrians and everybody in the area is[sic] going to be safe."

Although the confrontation had ended by the time the call was transferred to a dispatcher, the call was made while the incident was occurring as the caller explained. The caller's concern was the safety of those in the area. We therefore hold that the 911 call was "made to avert a crime in progress or to seek assistance in a situation involving immediate danger," and not to establish "evidentiary facts or 'bear[ ] testimony' against the defendant." *Pitts v. State*, 280 Ga. 288, 289-290 (627 SE2d 17) (2006); see also *Thompson v. State*, 291 Ga. App. 355, 358 (2) (662 SE2d 135) (2008) (where caller advised she had been hit and perpetrator was in a different apartment, call was nontestimonial in light of caller's need for medical attention and proximity of time between the call and the attack).[2]

*Judgment affirmed. Doyle, C. J. and Phipps, P. J., concur.*

---

[2]While Driskell does not challenge the admissibility of the 911 recording, we note that it was an admissible exception to the hearsay rule as a present sense impression. See OCGA § 24-8-803 (1); see also *Owens v. State*, 329 Ga. App. 455, 458 (1) (b) (765 SE2d 653) (2014).